Good morning, and may it please the Court, my name is Jennifer Garcia, and my co-counsel and I represent the petitioner appellant in this matter, Mr. Running Eagle. Since early 1988, the state of Arizona has had in its possession evidence that is materially significant to this case, and which was required to be disclosed pursuant to Brady v. Maryland. Despite numerous opportunities, the state has, to this day, the state has still not disclosed this evidence. The district court, when reviewing this claim, ruled that Mr. Running Eagle had not proven that the evidence in question was exculpatory or impeaching, and thus he had not met the requirements of Brady. This was an error. How do we know what evidence exactly was in the prosecutor's possession? Your Honor, we don't know exactly what is in the prosecutor's possession. What we do know has come from a transcript of a change of plea hearing in the jailhouse informant's case in this matter, and that transcript is in the ER. In this case, it's ER 1625. And what we've been able to learn from that, and it's a rather lengthy transcript in which Mr. Melendez is trying to... I've read the transcript. Go ahead. Okay. Sorry, Your Honor. He's trying to withdraw from the plea that he entered immediately after learning that he would not be given any special treatment or sentencing leniency due to his cooperation in the Tilden matter. And I think when you look at that, it is clear from the transcript in that case that the information he had concerned Mr. Tilden and his culpability in this matter. That's especially true when you get to the end of the transcript where... What page are you looking at? I think I have several pages here. In the beginning, he gives some rather vague information about how he... In page 8, which is ER 1628, that he would get a more lenient sentence... That he believed he would get a more lenient sentence because he had information and would testify at Tilden's trial. He states that Tilden spoke to him about the case completely. He had confided in me and also stated that the information he had came directly from Tilden and that the prosecution had visited him five times. Did he ever say, A, Tilden did it by himself, Running Eagle didn't do it at all, or B, Tilden said he was with Running Eagle the night the Williams were murdered? We don't know that exact information. All right. We don't know. No, but we do know that if you look at, again, this is page 86... And Melendez is dead. Yes, he is. He was dead at the time the post-conviction attorneys in this case found this transcript. So they were unable to speak to him at that time. So how can you say that what Melendez told the prosecution was exculpatory of Running Eagle? Because, very importantly in this case, if you look at the trial court special verdict, the trial court in the special verdict expressly found that Running Eagle was the one who killed the victim using the knife. And in large part, according to her reasoning in the special verdict, that was why Running Eagle received a death sentence and Mr. Tilden did not. And so the fact that there was information available at the time of the trial that would show that Mr. Running Eagle was not, in fact, the actual killer, or that would be more illuminating... What information was that? Say, for example... You're hypothesizing that what Melendez said was my case A, Running Eagle didn't do it, Tilden did it. Well, I think... But that's a hypothesis. We don't know that he would have said Running Eagle didn't do it, but we do know that his testimony specifically was about Tilden. If you look at page 86 of the transcript, his lawyer at the time said that Melendez had information that would assist the prosecution in prosecuting Tilden. He could assist in prosecuting a murder. That's on page 87. They talk about the problems that Melendez suffered in prison because he was going to be a snitch against Tilden in this case. And... But we don't know whether Melendez was saying case A, Running Eagle didn't do anything, or case B, Tilden was with Running Eagle. Well, I think it's clear that Tilden was with Running Eagle. I don't know that... No, no, no. Tilden's defense at his trial was he was a home-asleep alibi. That was part of his defense. Well, the answer is you don't know because it wasn't turned over. That's exactly right, Your Honor. And we also don't know if it exists. Well, we do know that there is evidence of at least something that must exist because, again, going back to the transcript, there is... On page 100 of that transcript, Mr. Reiss, who was Mr. Melendez's attorney, states that he wrote a letter to the prosecutor, Casey Scull, about Melendez's involvement in the Tilden case. And that letter has never been disclosed to us. And when the files for the county attorney's office were made available to the post-conviction lawyers in this case, that letter was not part of the file. Let me ask another question. If I remember the record, the public defender made a motion to determine counsel... Yes, Your Honor. ...in which he said, I'm representing Melendez, I'm representing Tilden, and maybe I've got a conflict of interest and maybe I can't represent both of them... Yes, Your Honor. ...because Melendez is talking to the prosecutors and he is talking about testifying against Tilden. I'm paraphrasing. Yes, Your Honor. That was in a notice motion, and a copy of that motion went to Running Eagle in 1988. Yes, Your Honor. At that time, Running Eagle's attorneys made no motion to discover any Brady testimony or anything that Melendez had said about Tilden or about Running Eagle. Well, earlier... Doesn't that bar Mr. Running Eagle now? Why didn't he make a motion back then? Where's the due diligence? I absolutely don't think it bars Mr. Running Eagle. Why? Because Mr. Running Eagle's lawyer had made a motion early on at the beginning of trial asking for disclosure of any evidence that would be mitigating or exculpatory toward Mr. Running Eagle. On page 2 of that motion, he had asked for information if there would be any use of informants in this case. That was a pretrial motion that he had filed. And the prosecutor's duty in this case was to notify Mr. Running Eagle's counsel if exculpatory evidence existed. And in this case, that motion to determine counsel was filed not by the prosecutor but by Mr. Tilden's counsel. And it simply stated that it had been informed by the prosecution that there was a possible witness against Tilden and that they were concerned about a conflict. It did not state... It said Melendez might testify against Tilden. Yes. It did not state what he would testify about. And there was no discovery at that point initiated by Mr. Running Eagle's counsel. Well, I think at that point, Mr. Running Eagle's counsel didn't know that there was anything he needed to discover. He had already asked for Brady information or for disclosure of an informant. And the motion didn't include anything that said, you know, would testify that Mr. Tilden was alone responsible or anything that would give him a hint that it was exculpatory. And I think because he filed a motion requesting this information, and if the information was, in fact, either exculpatory or impeaching in favor of Mr. Running Eagle, the prosecution had a duty to disclose that to him. So I think it was reasonable for Mr. Inouye to rely on the fact that while the prosecution had notified Mr. Tilden's counsel, he had not likewise notified Mr. Running Eagle's counsel that there was anything exculpatory or impeaching, which was his duty to do so. He didn't respond. Am I correct that the prosecutor didn't respond to the request for Brady material? That is correct. Nothing was disclosed to Mr. Inouye as far as his motion for discovery. And this was 1988 in Arizona? Yes, Your Honor. So how do we know about the note in the prosecutor's file that says Tilden the killer with the question mark and then the question mark crossed out? We know about that because one of Mr. Running Eagle's prior habeas counsel, and I apologize, the procedural history of this case is extremely complicated and there's a lot of lawyers, but she represented Mr. Running Eagle very briefly in his habeas proceeding. And she went to view the file at the prosecutor's office, saw that note in the file, and requested copies. At that point, we had – I think there was nothing that had ever been given to us about what the prosecutor thought about the Melendez testimony, and at least it was something that was a hint that they had at least considered that possibility instead of what they did argue, which was that Running Eagle – Ms. Garcia, are you changing your position from February 3rd where you said Running Eagle is not arguing that the note previous counsel saw in the file is itself the Brady evidence improperly suppressed in this case? No, I'm not changing my position. I think we talk about the note because it gives us information that at least there was something that was being considered, but I agree that that was work product. We have not expected this – And it's also speculation by somebody who wasn't a witness. We don't even know whose note it was. I mean, it was completely anonymous. So I think we're not saying that that note itself – I can't imagine what kind of exculpatory value a note written by an unknown person in the prosecutor's office would have. It simply helps us to show that at least there was some kind of conversation going on about this in light of the fact that since 1988, we have not received any information about what Mr. Melendez's statements were. We know that he met with the prosecution and with detectives at least five times and that there has to be somewhere some information about what those meetings consisted of and what the information Mr. Melendez had was. And it has still never been turned over to us. And I think if you look at the situation in this case, it's analogous to a recent decision of this court in Williams, which I also cited in my February 3rd supplemental authority letter. And in that case, the attorney general's office found a packet of letters which had not been disclosed. And they looked at it, did not believe that it was exculpatory and impeaching in any way, but still turned it over to defense counsel during the post-conviction proceeding. Said, we found this. We know it hasn't been turned over. We don't think it matters, but here it is. And that's very different from what has happened in this case. This Brady claim has been litigated since 1988 when – or excuse me, since 1998 when Mr. Wedding Eagle's post-conviction attorneys found the transcript and first got information about at least enough to infer that what Mr. Melendez would have said was inculpatory toward Mr. Tilden. And we still don't have the document. And have you requested those documents? We have – actually, several times. There have been – you know, first, again, there was an initial motion filed in the trial asking for all the things to be turned over. And then during the post-conviction proceedings, if you look at the PPR petition, they asked for a hearing and discovery and subpoena power in order to get documents and files. It was all denied primarily by the state court. And the same thing in – It was denied on the basis of Arizona Rule 32.2a. Well, that's an interesting – Because it had not been made the first two times in the PCRs. It was confusingly denied pursuant to – Not at all. It said claim number four is denied under Rule 32.2a. That's not too confusing, is it? Well, I think the part that is confusing is the part directly prior to that where it says even assuming these claims are colorable. Because directly after the court issued that order, Mr. Running Eagle's counsel filed a motion for rehearing in which he asked the court to clarify. Because since this claim was raised as newly discovered evidence, it didn't really make sense to say that it should have been raised in a prior proceeding. So he asked the court to clarify whether it was a ruling on the merits or how are you saying that this was precluded. And in the order on the motion for rehearing, the state post-conviction court very clearly said that it was merely denied pursuant to Rule 32.1e. And Rule 32.1 is the rule that lays out the grounds for relief in a post-conviction petition. So that was, in effect, a ruling on the merits. That was stating that it didn't meet the grounds for relief as newly discovered evidence. Why was it newly discovered evidence if, in 1988, when the public defender noticed a motion to determine counsel, in his declaration he said, Melendez is ready to testify against Tilden. Why is it newly discovered evidence in 1988 when Melendez has his plea transcript? Well, it's newly discovered because, at that time, Mr. Eniguez was not given notice that this was exculpatory toward Mr. Running Eagle. But you had notice in 1988, did you not, that Melendez was going to testify against Tilden? Well, actually, the motion itself said that Mr. Melendez would not be a witness against Tilden. That was, I think, the last line of the motion, that Mr. Ehler had said that he would not be calling Mr. Melendez. Because he'd gotten Antone. At that point. Right. But notice, again, when the PD wanted to find out from the court whether he could represent both Melendez and Tilden, it said, Melendez is ready to testify against Tilden. A copy of that went to your Mr. Running Eagle's counsel. Yes, it did. Why do you say it's newly discovered evidence to say ten years later, oh, Melendez was ready to testify against Tilden? Ten years later. The newly discovered evidence is not that Melendez was ready to testify against Tilden. It would be the content of what it was he was going to say. But you knew that he was going to testify against Tilden in advance of trial. And there was no motion to take Melendez's deposition or to take further discovery at that time, was there? No, there absolutely was not. And you're not making an ineffective assistance of counsel claim as to the failure to do that. I would love to do that, Your Honor, but unfortunately, I'm a habeas attorney, and it's not that easy. I get what I get. Is that precluded procedurally, an IHC claim on that ground? It would be, yes. Because it wasn't raised previously? Yes. Was that ground ever raised, even to the state court? I don't think it was raised to the state court. I could be wrong because the last post-conviction petition that was filed by Mr. Running Bill's previous habeas counsel, I think, raised 132 claims. I don't remember that that was one of them, but it might be. To me, that would be a much stronger claim than what you're raising now, with the IHC against the attorney for not getting the documents that Melendez put on notice that they were there, or at least trying to get the documents. Well, and I certainly think the performance of the attorney in this case in many aspects was not what it should have been. But I do think in this situation that he was not given enough information to know what was out there. I mean, again, the prosecution has a duty. So once that motion was filed, he was unnoticed. There was some witness out there that the prosecution had talked to. Your Honor, that witness could have been about anything. I mean, I think if you look at this trial, it was a lengthy trial. There was a great deal of evidence. The prosecution was looking at things, trying to combat children's alibi defense, trying to present the physical evidence, going through all the evidence that was seized at Mr. Running Eagle and Mr. Children's home. But that's another question. I mean, the prejudice aspect of the Brady claim, there was only one knife found, right? And it was found in Running Eagle's possession. Yes, it was. And it was shown that the Williams were killed by knife wounds. Yes, Your Honor. But it was never proven that the knife they found in Mr. Running Eagle's vehicle was, in fact, a murder weapon. They took it. They had it sent out for testing. They were unable to find any traces of blood or tissue on the knife. So while he did have a knife, it is not clear that that was the knife that was used in the murder. The murder weapon has never been definitively located. And was there ever a knife found on or near Children? Not that I'm aware of. But if you look through the transcript in the aggravation mitigation hearing, there are actually several references to children using a knife in prior instances of criminal activity. There is an allegation discussed by the prosecution in that hearing that he had threatened to kill his grandmother with a knife when he was a teenager, that he had cut up her house and furniture with a knife, another allegation that he had committed an armed robbery using a knife all prior to the time of the crime in this case. So I think the fact that the victims were stabbed and that Running Eagle was found to have a knife does not definitively show that Running Eagle was the one who stabbed them. But just quickly back to the motion to determine counsel, I really would like to stress that I think a prosecutor's Brady obligations are not discharged by co-defendant counsel filing a motion that contains very little information. I mean, the bottom line here is Brady puts an affirmative duty on prosecutors. And it continues. Exactly, Your Honor. It continues. It's a continuing duty. It's an affirmative duty on them. And I think, you know, we cited in our brief the Banks v. Drexel case. And that case is very clear about the fact that… You can draw the inference that because they were so stubborn about not disclosing that information, that maybe there's something there that is exculpatory. Exactly. Or maybe there's something about the Melendez. He does seem to fit the template of a professional snitch in a prison who's looking to help himself to the detriment of others. And I can't understand why the prosecution just doesn't turn that stuff over. I agree, Your Honor. I think that that certainly… If there's some information there that involves national security, you can always ask to be turned over to the judge in camera to look at it. No, that's exactly right, Your Honor. And I think the difference to me has been highlighted quite a bit in my preparation for this argument because the vast majority of Brady cases that you read, the evidence in question has been turned over at some point. The prosecution or the government might be arguing that it's not exculpatory, it's not impeaching, it wasn't suppressed. There's still arguments about whether or not Brady applied. Or that the information was in a drawer of some investigator who didn't turn it in. Exactly. So there's still questions under Brady, but the information itself has at some point been turned over. And that's very different to this case in which it's still 23 years later. We still don't know what this information consists of entirely. We do have enough to say that it was inculpatory toward Tilden. The information that was found in post-conviction, I think, is enough to show that at a minimum, if it could show that Tilden had a greater involvement in the crime than was decided by the trial court in the special verdict, it definitely throws it down. Well, the trial court found two of three aggravating circumstances in the special verdict as to Tilden. Yes. The only one they didn't find was that Tilden had committed the crime for pecuniary gain. They found that, pardon me, he found that as to running Eagle. Yes. So I think you can assume from that that first he found it was a heinous crime, and secondly there were multiple murders. Yes. So they found that Tilden was involved in a heinous crime, multiple murders, no pecuniary gain. Yes. So why do you say that there wasn't Tilden involvement in the special verdict? I don't mean to say that the trial court found that he was not involved at all, but the trial court expressly found that his involvement was limited, that running Eagle was the one who did the actual stabbing, that Mr. Tilden was a follower who followed Mr. running Eagle's lead, and that was the theory of the crime that she laid out in deciding that Mr. Tilden deserved leniency. So there's no reason to doubt that had there been evidence presented that Mr. running Eagle was not, in fact, the leader and not, in fact, the one who stabbed the victim, that she would not have received the same consideration from the trial judge when she was determining things. Is there another? What is the standard of review? Was this claim procedurally defaulted or was there a summary determination on the merits? In light of the recent Richter case, I think we need to understand exactly what the standard of review is. I think that's an excellent question, Your Honor, and I actually did discover yesterday as I was preparing my outline that there's a little bit of a discrepancy about that here. This claim was not found to be procedurally defaulted by the district court, but the proceedings in this case were fairly protracted because of the Ring and Summerlin litigation, and so much earlier on in its interim order regarding the procedural status of the claim, the court found that this claim was not procedurally defaulted as it had been ruled on by the merits by the post-conviction court and thus would be reviewed on the merits by the district court. Much later, following several years of stay and briefing on the sentencing claims and motions for evidentiary development, when deciding this claim on the merits, the district court reviewed the claim de novo under PIRTL, saying that it had been raised to the state court, but the state court had not decided it, and that is a discrepancy. So it appears that the district court judge used the more lenient de novo standard when reviewing this claim. I don't think anyone has noticed that before. It hasn't been raised by the attorney general's office either in a rehearing motion or in their answering brief. We did state that in our opening brief that the claim had been reviewed de novo by the district court. I just had not caught the discrepancy between the fact that initially the district court had said that it was decided on the merits. So what did the state court do? What did the state court rule on that claim? The state court, that was the discussion that I had with Judge Bay a few minutes ago about the motion for a hearing. Article 32.1E? Exactly. It was dismissed under that. Is that on the merits? Yes, it is, Your Honor. So I think as the district court ruled on this claim de novo, it should have been ruled on exactly as you're saying, like Richter was, where although there was a ruling on the merits, there were no findings, and so we would have to show that there was no reasonable basis to affirm the state court's findings in this matter. That's not how it was decided by the district court. I think either way I'm perfectly comfortable here. I think that under Brady v. Maryland and the accompanying Brady cases that I've cited in the brief and that was talked about today, there is no reasonable basis for the state court to have dismissed this claim on the merits. I think it's very clear that there is evidence that would be either exculpatory or impeaching to Mr. Do you agree I'm reading Richter correctly? I absolutely agree. I think the exact language is that the court is required to search the record to see if there is a reasonable basis for the state court's decision. And has that been done? I'm wondering if a limited remand to the district court to apply the correct standard in light of Richter. It is hard for me to say. It was, as I said, it hasn't been raised by anyone that they used the incorrect standard, and I really am not sure. But, again, I'm comfortable either on a de novo basis or under D-1 to say that this was an unreasonable application of Brady v. Maryland. Can you spell out why ruling under D-1 is unreasonable? Absolutely. I think the test under Brady has been laid out very carefully in numerous United States Supreme Court decisions, probably most specifically in the Strickler v. Green case that says you have to show that the evidence was exculpatory or impeaching, that it was suppressed, and that it was material. And I think we have made a showing of all of those things in this case. I think we know from what was discovered during post-conviction that, at a minimum, this information, that Mr. Melendez had information that was important about Mr. Tilden's role in this crime, that it would have been useful in prosecuting Mr. Tilden for this murder, and that it didn't, from what we can tell, apply to anybody else. And that is absolutely true. From what we can tell what? That it wouldn't, his information didn't apply to anyone else in the case. It wasn't also against Running Eagle or also against Antone. It was specifically stated by Mr. Melendez and Mr. Melendez's counsel that this was information that would have been helpful to the state in prosecuting Tilden. And that information has never been disclosed. The state did not provide Mr. Iniguez or Mr. Running Eagle notice that there was any evidence out there that could have been exculpatory or impeaching, and that is their duty under Brady. I think we still don't have the evidence. There could be no question that it was suppressed. And I think reading the special verdict and looking at what the trial court found in sentencing, there can be no question that it's material. She found the three enhancements against Running Eagle, and she didn't find the pecuniary gain against Tilden because Running Eagle had all the stuff. Yes. Okay. So it didn't look like Tilden had profited or was motivated by that profit. Right. At least it wasn't clear. Okay. So isn't it equally likely to assume that all this would have done is gotten Tilden the death penalty too, not have made Running Eagle less guilty of this reading? That's possible, Your Honor. But I still would say that that undermines confidence in the result. I think it's still evidence that could have changed the outcome in this case. And I think when you read the special verdict, it is very clear that Mr. Tilden is getting leniency due to his role in the crime, which appeared to be minimal based on the evidence that was presented at trial and at sentencing. And were the same to be true for Mr. Running Eagle, I don't think anyone can say that there's not a reasonable probability that that affected the sentencing verdict in Mr. Running Eagle's case. Okay. What's the standard for getting an evidentiary hearing on this issue? In district court or in state court? Well, in district court now. In district court now, we would have to show that Mr. Running Eagle had been diligent in pursuing an evidentiary hearing in state court and had been denied. All right. But then do you have to also show that he would probably prevail on the merits? That would probably prevail on the merits, yes. And in this case, the district court found that Mr. Running Eagle had not been diligent. And, again, I think that that ruling was certainly in error. I think we've shown that he asked. In a large part, the district court's ruling on that part of this case was based on the fact that she or he said she, it was not she, that he had found that there was enough notice at the time of trial for this information to have been discovered. That's absolutely incorrect. It wasn't. It wasn't disclosed. The prosecutor did not give out anyone, did not give anyone information. Well, the request was made before the trial. Exactly. The defense made a request. The state did not comply with it. The state gave notice to Mr. Sullivan's counsel that there was evidence, did not satisfy their duty under Brady to also give that notice and information to Mr. Iniget. And so from there, everything that the district court looked at was that because it should have been discovered at the time of trial, that he couldn't have been diligent in pursuing it in state court conviction. And I think that's just simply wrong. I think we have plenty of evidence that he was diligent. And in the state court conviction petition where this was raised, Mr. Running Eagle specifically asked for an evidentiary hearing and discovery and use of the court's subpoena power in order to get additional evidence to prove this claim. And the court just denied it out of hand. Exactly. In the third PCR. Yes. And denied it because he hadn't asked for it in the first two PCRs. Well, technically, he didn't have a second PCR. That's, again, kind of a procedural quirk of this case. But in the first post-conviction proceeding, at that point, no one had discovered what the Melendez evidence – that this evidence existed. It was only – The first PCR was after conviction. Yes. They were on notice that Melendez was ready to testify against Tilden before the trial. They were on notice that there was a possible witness. They had no idea what the information was. And I really do think that – It was information bad for Tilden because that's what against Tilden means. No. I agree. I'm taking past your time. No. Okay. I'm sorry. I will sit down. When was the transcript of the other trial discovered? The Melendez? That was discovered by the lawyers who represented Mr. Running Eagle in his third post-conviction proceeding. So that was discovered and that was why – that was newly discovered and that was why the claim was made in the third – Exactly. – the first time. Exactly. And it was ruled on the merits. They didn't say it was procedurally discovered. Exactly. Yes, Your Honor. Okay. Thank you. Thank you. We'll hear from the state. May I please the Court? My name is John Anderson representing the State of Arizona Respondents Appellees. First, the petitioner has conceded that the note is not braided material, so I won't address that further and focus on the Melendez matter. I would like to point out that the – Well, what did you just say? I'm sorry. Conceded what? The petitioner has conceded that the note that was found in the prosecutor's file – Oh, that note. – when they were allowed to look through the prosecution file, to go through it without any supervision, that that itself is not braided material. That little poster. We don't know what it was, Your Honor. It was evidently – it was some writing and some notes that were taken by somebody in the prosecution team. We don't even know who wrote the note. Well, it was from someone on the prosecution team. Could have been. Could have been a detective. But anyway, at any rate, they're conceding – They're part of the team. They're part of the team anyway. That's true. But they're conceding that that's not braided material, so I'm going to focus on the Melendez. Yeah, forget about that. So Melendez, they had a duty to develop this Brady plan in the post-conviction proceedings, and they didn't. The mere fact that they asked for an evidentiary hearing doesn't mean that they complied with the diligence requirements. Well, did the prosecutor in this case comply with Brady? That's a different question, Your Honor. Well, that's the question I'm interested in. Well, we don't know whether they complied with Brady because there's nothing before the court to show that it was braided material. Well, how is anyone going to know unless it's been – I mean, what was the problem with just letting defense counsel have a look at that material that they asked for? That's exactly what we did in the third rule of 32, Your Honor. We let – I don't know if it's a man or a woman – Wiesendorff look through the prosecution file, and they did, and they didn't discover anything else in the file. Were those statements in there, the police – reports of the police interviews? Evidently not, Your Honor. They've never said anything about it. They've never asserted that there was anything in that file. But, you know, that's potential Brady material and it should have been in that file. Did we know if there were any written statements taken from Melendez? No, we don't know that there was any – that there were any statements at all that were taken from Melendez. And they never asked to see – in this case, they never asked to see the Melendez file. They might have been in the Melendez file. They don't have to ask for specific files. You don't have to give it to them. No, but they have a duty in the post-conviction proceedings to develop their claim. And if they had asked to look in the Melendez file, we would have granted it just like we let them look in this file, in this case, in the Field and Running Eagle case. You could have saved us a lot of work and just – when you discovered the – when you got on this, just to disclose this information to the defense attorney who's here. Well, in post-conviction relief proceedings, Your Honor, it's the duty – I'm talking about complying with the law, with Brady. Oh, Your Honor, they don't – There's Brady material there, and you didn't turn it over to them. No, that's not true, Your Honor. We don't know what the material was, so we don't know if there was a Brady file. Well, you're supposed to look through your files. You're supposed to make a reasonable effort to gather all that information and turn it over to the defense counsel. Well, that's true. Any material that could be exculpatory or could mitigate a sentence or anything that might be of benefit to the defendant. And here you were – the police were talking to what appears to me to be a jailhouse snitch. I mean, it has all of the earmarks of it. All you've got to do is read Steve Trott's article in the Harvard Law Review. Have you ever done that? No, I haven't, Your Honor. Do you know who Steve Trott is? Judge on this court, I believe. Yeah, and he lectures to people in the Justice Department and around the circuit on Brady material, uses of jailhouse snitches, and how they should never be used. Well, I think that's the point, Your Honor, is that the jailhouse snitch is inherently unreliable, which is why the prosecution went ahead and didn't reach the jailhouse snitch. Well, that's because they got the other guy turned. Well, that's true, Your Honor, because he was an eyewitness. Orva Anton was an eyewitness. He had no prior criminal record. He was a much more believable witness. And besides that, he was pleading guilty, which was taking care of himself and pleading against both of the co-defendants. So can I just follow up on something you said? You said they didn't ask for the Melendez file. Is there a Melendez file? I assume there must be. I have no idea. Does it contain any exculpatory? I've never looked through the Melendez file, Your Honor. But wouldn't it have come under the first request for Brady material? You're talking about pretrial? Yeah. No, the Brady material. If it contained exculpatory, wouldn't it have fallen under that very first request? Someone should look at it and know what's in there. Well, but I think that goes back to Jay's point, was that they were on notice that there were some discussions and that they had asked for more. But they had already asked for all Brady material. You're withholding some and so they need to ask for more. But they had more specific knowledge. So they're supposed to figure out under Brady which file something might be contained in? Well, yes, when there's a pretrial notice that the prosecution is talking to a particular witness. I don't know. I thought that coming into this argument that now you just throw out, well, they didn't ask for the Melendez file. That's not the standard under Brady at all. They don't have to ask for the Melendez file. Well, it's also a standard. It's not a guessing game. Counsel, may I give you a piece of advice? Yes, Your Honor. Don't interrupt judges when they're talking. I'm sorry. I wasn't aware I did say that. I certainly try to be polite in all instances. It's okay. But it isn't a guessing game. Brady's not a guessing game. You ask for the material. You're supposed to do a good faith effort to look at all the files in which the material might be reasonably located. Right? Yes. But our point would be that they also have a duty in the post-conviction proceedings or in habeas to develop Brady claims that they know about. Right. But the state court, this is, I think, a very interesting and telling point, especially under Richter. The state court didn't say on this claim that they weren't diligent. The state court ruled on the merits. Well, the state court, if I may explain that, Your Honor, the state court in the motion for a hearing denied it on the basis that it wasn't Rule 32.1E. And Rule 32.1E, one of the prongs of 32.1E is that it has to be shown that there was diligence in developing it. So that was one of the reasons. Do you want us to, under Richter, assume that one of the reasons was there wasn't diligence? No, I'm not asking you to assume anything, Your Honor, because the court specifically said that it wasn't a Rule 32.1E claim, and one of the three parts of the 32.1E is that the defendant has to show diligence. Well, you know, there's plenty of evidence in this record to satisfy me that Judge Rosenblatt was wrong on that issue. And there's plenty of evidence to show that Running Eagle's counsel diligently tried to develop his claim at trial and not habeas review. Well, I think one of the questions is, did he try to develop it in Rule 32 proceedings? Under Michael Williams, they have to be diligent in developing claims in Rule 32 proceedings. See, what you're saying, the message you're giving me is, yes, we violated Brady, but ha, ha, ha. No, sir. They didn't give us, they didn't follow this and they didn't follow that. No, sir, there's no indication in this record that Brady was violated. I'm not conceding that in any way. Well, you don't have to concede it. It's obvious to me. You had the material. It was exculpatory. Arguably, it could have affected, we don't know. We just don't know. And, you know, it's playing these games that, particularly in a case that involves a death penalty, it's playing these games that causes these cases to sit around for years and years and years. Your Honor, if you look at Brady, Brady has three requirements. One is that it can't be, it has to be Brady material. It has to be exculpatory. If it was inculpatory towards running ego, there's no evidence that it was exculpatory. How is anyone going to know that if they don't see the material and read it? How? Well, and that's the point, is they have to develop that in Rule 32 proceedings. In state post-conviction proceedings, we don't know. Explain this. So this is the third proceeding, the third habeas, right? I can't find the ruling on the third habeas, but that's okay. I mean, I can look at it later. But what they came to the court with at that time was they had found the transcript of Melendez's testimony that he had given the prosecutors information about Tilden, right? Yes. That was the basis. Okay, now what else should they have presented to this state court? What else could they have presented? Should or could? Yeah, well, they could have gone to the other defense attorney, Mr. Ray. They could have gone to Melendez's attorney and asked him for an affidavit. They could have talked to Casey Scull, the prosecutor who talked to Melendez. They could have asked the court to depose Casey Scull, the prosecutor. They could have asked the court to depose Melendez's attorney. So there's several ways. They could have particularly asked for the Melendez file. So there's several ways in which they could have developed it in the Rule 32 proceeding. Did they ask for an evidentiary hearing? Yes, they did. In the court? And they asked the court to employ subpoena power? The court just denied it. Well, but Baja versus Ducharme and Lopez require more. They require the defendant to assert evidence, specific affidavit, which they didn't do in this case. And when you don't produce any evidence and just make allegations and requests, that's not sufficient diligence under Baja and under HEDPA. So you're saying then, assuming that the defendant makes a proper request under Brady, that the state is not required to turn over any material that arguably might be exculpatory or could affect the sentencing outcome or the other matters discussed in Brady, the remedy then is for the defense to bring a discovery motion, ask for a hearing, start subpoenaing all that. Should that be done before pretrial? I think we're talking about two different things, Your Honor. I mean, clearly the state has a duty to make Brady disclosures, but when it comes to post-conviction proceedings and exercising due diligence for the HEDPA, the burden shifts to the defendant to show that there's a culpable Brady claim, and they need to show diligence in developing a record, and they didn't do that here. Even Wiesendorf's affidavit, they didn't present until I was about to know. But they did file a proper Brady request pretrial. Well, once again, Your Honor, I hope I can make my point more clear, but that's a separate thing as to what happened, whether it was Brady material, but there's still a duty for the defendant to show— They did file that request. They filed a request for Rule 15, which is a matter of state law, and incorporates Brady. Well, wait a minute, you know. Didn't they ask the prosecution before trial for all material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce his or her punishment, therefore elipses, unquote? That's correct, Your Honor. There was a motion under Rule 15 in the state rules for disclosure in that. So how do we know the state court found a lack of due diligence that didn't conclude that the facts probably would not have changed the verdict or sentence? Well, it found that there wasn't a claim under Rule 32.1e, and 1.e has those three requirements. Right. So how do we know which requirement it was? Well, we know that at least one requirement was lacking, or another one would be that it wasn't material. In this case, it certainly wasn't material, because even if Hilden had said, I did it all myself, that would go completely against the evidence. I'd show that Ronnie Eagle's palm print was above the body, his statement that he hit them with full force, the fact that he had the knife. Hilden didn't have a knife. Cheryl Sivertson testified that Hilden at this time did not have a knife. We're not talking about guilt or innocence, all right? They were found guilty. The sentence was there. What we're talking about is the state complying with Brady, with a plan fair and square under the rules laid down by the Supreme Court. That's my concern. That's my concern. I'm not saying that it would have absolved Ronnie Eagle or whatever, but we're interested in fair trial. Rule of law. They ask for it, you give them this Brady material. You don't play games with the system. I'm not saying that you did, but the states like to do that. Your Honor, we're also concerned with the rule of law, and the rule of law in this case is Brady, and the law says that there's three requirements for a Brady claim. One is that it should have been disclosed. Even assuming that that's true. Secondly, they have to show that it would have been exculpatory. Under Wood v. Bartholomew, we would have to speculate. It's complete speculation as to where it would have been. If you had a problem with it, you could always ask the judge to look at it in camera. There's no indication that the state had a problem with it because we don't know what it is. But the third branch of Brady is materiality, and it seldom would have said that I completely did it myself or an eagle was sleeping. That would have been completely contrary to the facts that were brought out at trial, so it wouldn't have been material under the third branch of Brady. And it also wouldn't have been admissible as a collateral exculpatory statement under Rule 804B3 of Arizona Rules of Evidence, which has been upheld by this Court in LeGrand v. Stewart, where in a similar case you had two brothers, in this case cousins, and one brother tried to take all the responsibility for a double stabbing. Arizona Supreme Court said that that wasn't admissible under Rule 804B3. Similarly, in this case, it's the same thing. Mr. Anderson, could I summarize, see if I've got your position correctly. You don't deny, you don't dispute the fact that Running Eagle's counsel made a Brady request in advance of trial, true? Correct. But you say that now that we're in the post-conviction stage of this, the burden shifts to Mr. Running Eagle to show that this material, the Brady material, A, existed, and B, was exculpatory in material. Correct. That he had his chance to do so in the state PCR proceeding, the first one, that he filed pro se with an amendment when he got counsel. He had a chance to do so in the second one when the Arizona Supreme Court sent it back after final decision. And he didn't do that. And when he tried to do it in the third state PCR, the court found that he had not complied with Rule 32.1E, part of which was diligence, part of which was a requirement of materiality. Is that your point? Yes, I think that pretty well summarizes our position, Your Honor. And if I may point out, there was overwhelming evidence, one of their claims, well, their claims shift because they can speculate as to what Melinda said. At first they're saying that it would have completely exculpated Running Eagle, which is contrary to the evidence. One of their points is that, well, it might have shown that Tilden was the stabber and not the Running Eagle, but all the evidence was that it was Running Eagle's knife, his palm print was above the body. So even if it would have come in on that point, it would have been contrary to the evidence and not material, even as to the sentence. Well, just because it comes in contrary to evidence doesn't mean that it isn't material. If it's contrary to, if it contradicts the evidence that it's already in, that doesn't make it immaterial. I mean, the jury decides what the weight of the evidence is. The important thing is that when you have these cases, the law ought to be followed and not come up with a lot of excuses, whatever it is, 20 years later. And that's what delays all these cases. That's where we get them. And if the prosecution ran a clean trial, we wouldn't have these issues. We wouldn't be here today. Your Honor, I can't talk about other cases. I'm only prepared to talk about the case today. But one of the components of a Brady claim is that material is a little bit misleading. It has to be shown that it was prejudicial. For instance, in the Shadd case, there was evidence that wasn't disclosed by one of the state's witnesses. But this Court did a proper analysis in Shadd on that issue and said that there wasn't a Brady claim because it would have been material. It wouldn't have changed the results. So part of the analysis of the Brady is whether it's material and whether it would have changed the results. So it is proper for this Court to analyze whether, even if Melinda said, listen, Running Eagle was asleep, I had nothing to do with it. I took his car. I took his knife. I did the stabbing. I put his palm print above his body. I put his shoe print all over the place. Even if he said that, that wouldn't have changed the result because it would have been completely contrary to the evidence. Plus, Melinda, this is a five-time felon. He was willing to offer— I know they're bad guys, you know. We know that. We know that. And the only point I'm trying to get across to you and to whoever else is listening that you had this material and you had a proper request and whether it's— if you didn't think it was— there's no way in the world it could be exculpatory and you can ask the judge to look at it in camera. We wouldn't be here. But I don't think Brady says that it's— for the prosecutor to decide whether something is exculpatory or not and the mere fact that it wasn't turned over and it wasn't in this file certainly raises the suspicion that there was something to hide. Once again, we're— As they say out in the desert, where there's smoke, there might be fire. Your Honor, we're engaging in many hypotheticals today about speculating as to what the evidence would have been, whether it was in Brady and in the Wood v. McCullough.  I'm saying you had a duty to disclose and that was ignored. I agree, Your Honor. The State has a duty to disclose Brady material, but in post-conviction proceedings, the defendant has a duty to— I'm just talking about the future. I agree, Your Honor, and certainly Brady is an issue in many of these capital cases. Your point is that the defendant petitioner here has not developed that this was Brady material. Exactly. Thank you, Your Honor. I think we're kind of talking past each other. Can I ask you a question? Certainly, Your Honor. Off the record. I don't know. The original defense attorney, where did that person come from? For whom, Your Honor? For— Running Eagle. Running Eagle? Running Eagle and the other fellow. Well, actually, that is part of the record, Your Honor. It's part of the record. Tom Foster was originally appointed to represent Running Eagle, but he had Running Eagle ask to have him taken off the case, so Foster was taken off the case, and then Balthus— because the public defender's office was representing Kildon, he couldn't appoint the public defender's office, so Balthus or Enigas was evidently on the list, on the appointment list. Yeah, appointed, but they weren't public defenders. No, the public defender's office represented Kildon, Mr. Steinway, and Fred Graham, and they did an excellent job on that. How much were they paid? The public defenders? Not the other one. I have no idea how much Balthus or Enigas was paid, Your Honor. Did they have a budget as to what they could spend for experts? That's outside the record and outside my knowledge, Your Honor. No, it's—we've seen some cases where, at least I have, where for appointed counsel, you know, the budget could be— you know, you've got $500 for the defense and spend $250 for the experts. I don't know how much they're paid, Your Honor, but I can avow that the public defenders at this point are appointed— attorneys are paid better than I am. Oh, I know. I don't have any problem with public defenders. I want to explore the prejudice aspect of Brady. So I gather that the argument is that the result of sentencing would have been different had this material been produced. What is your position on that? Why do you think that the result of sentencing— Well, in the sentencing, I think as Judge Baird had pointed out, there were three aggravators against Running Eagle and two against Tilden. But also as to the judge's finding that Running Eagle was the stabber, it wouldn't have changed that because there was no evidence. Cheryl Silverson testified that Tilden didn't even have a knife. She was the eyewitness? Cheryl Silverson was Running Eagle's girlfriend. I spent a lot of time with them. And she testified that Running Eagle had this 10-inch Rambo knife that he always kept in his car. Many witnesses identified Running Eagle, which was found after the crime, and which Bolduc, the medical examiner, testified was consistent with the wounds that were caused from both victims. So what other evidence was there that it was Running Eagle who stabbed? Well, also Running Eagle's statements to Silverson that he hit them full force. And was there an eyewitness or a neighbor who saw something? Janice Smith, Your Honor, was an eyewitness to woke up and saw three people outside, and he heard some yelling. So it wasn't an eyewitness to the actual murders, but it was an eyewitness to there being two people outside. I'm just wondering, would the state trial court's determination that Running Eagle was the stabber have been altered by anything that Melendez would have said about Tilden? Well, the only thing that he could have said was he could have said, Well, Tilden said Running Eagle wasn't there at all. I stabbed them both. But that would be inadmissible under Rule 804b-3 as it was in the McGran versus Stewart case. What is that rule, 804b-3? I'm sorry, McGran versus Stewart? Yes. No, I wrote that down somewhere. Here we go now. I believe it's one. It's from this court, and it's on the back of one of mine. I believe it's 133F-2nd. Why would that be inadmissible? The statement of an accomplice exculpatory of the other accomplice is inadmissible? That's correct. Under McGran versus Stewart, the side is 133F-3rd-1253, and it's the federal. It's the same rule as the federal rule, a collateral exculpatory statement that's inculpatory for the declarant. An exculpatory as to the accused is inadmissible unless there are clear circumstances of reliability, and that's been upheld. This court's upheld the federal rule in the United States versus Fowley, which is 24F-3rd-1059. It's upheld just recently. It's upheld the Idaho version of that rule in Rhodes versus Hanley, which was a decision of Hanley. And your point is that the clear evidence of reliability was all the other way, was the ability to palm print, the ability to shoe print. Exactly, because of the other evidence and because of the fact this was a snitch, and I believe this court said in Maxwell versus Rowe that the snitch testimony is one of the most unreliable forms of testimony, and that's why the prosecution decided not to use it. Melendez had five prior felony convictions. The felon's attorney would have had a field day if they had tried to bring Melendez in to testify at trial, and you're a snitch, you're a criminal, you've got all this incentive. So Melendez would have been a horrible witness, whereas Orva Anton was an eyewitness. I mean, he wasn't an eyewitness to the stabbing, but he was an eyewitness to what happened in the car park, and he had no prior record at all, so he was a much more believable witness. So it would have been a credibility contest between Melendez and Orva, trying to testify, which one do you believe? Somewhat. I mean, there was a lot of different things that Orva testified to, but, yeah, if Melendez would have testified to Tilden and said Running Eagle wasn't there, it would have clearly been contrary to Orva Anton's testimony, because he testified extensively about how they got together, how Running Eagle said he wanted parts to make his car run better, look better and run faster. So, yeah, Orva Anton was obviously a key witness, but there was very strong physical evidence, including Running Eagle's palm print, 100 points of identification, just above the bodies on the dryer, above the blood. Besides, you also have his shoe print in the car park, and blood in the car park, in the house, and an unblemished shoe print on the door, because Williams attempted to retreat into the house, and the door was broken down. So what sentence did Orva get? Orva Anton had a plea agreement, which I believe is in the record. He was eligible for probation, but I can't remember the exact sentence that he got. I'm not sure that's in the record, but it certainly was less than Tilden and Running Eagle, and reasonably so, based on his lesser involvement. I assume the Court doesn't have any questions on any other issues. I would just urge this Court to apply the proper Brady analysis that we've had in other cases and find that it would be speculative under Wood v. LaFallonieu, and it wouldn't be material under the similar analysis this Court didn't show. If there are no more questions, I will sign off. Thank you very much. Thank you. I just have a couple of very quick points. I know I'm almost out of time here. First, going back to Mr. Anderson's argument about the open file policy of the prosecutors, there's a footnote, 23, in Strickler v. Green, that says if a prosecuting agency has an open file policy, that a petitioner is entitled to rely on the fact that the Brady material will be in that file. Letting us go look at a file that doesn't contain the information that we need does nothing, and I think that's something that the United States Supreme Court has recognized. Why wouldn't you know that there's a Melendez file? Why wouldn't any of these attorneys have known, once they knew about Melendez, that there would be a file on Melendez? There likely was a file on Melendez, but I think at this point, not knowing where the attorneys were or what was going on, this was something that the attorneys needed the Court's subpoena power to get, in addition to the depositions and everything else. In Arizona. Was that necessarily so? I mean, there were, Mr. Anderson mentioned a whole number of steps that could have been done in connection with this third PCR that didn't necessarily involve the subpoena power. I think there, as far as what they were able to do, when they discovered the transcript that led them to the fact that there was at least enough there to know that this evidence was against Mr. Tilden, it involved his role in these crimes, and thus it could have been inculpatory or impeachment evidence from Surrender Eagle. I think at that point they got that transcript, which was publicly available. They attached it to the petition in order to show, look, this is a colorable claim. We need to use the processes of the Court in order to develop this. And in Arizona, you're not allowed to use the Court discovery or subpoenas or anything like that until you're granted an evidentiary hearing. It's an issue about the Court has to find that your claim is colorable before it expends resources to allow you to develop it. So all they could have done would be things that they could get on their own. For example, if an attorney would agree to talk to them. But I have not seen a case where a county prostitutor would agree to sit down and talk to defense attorneys without a subpoena, without findings of waiver of privilege or anything like that. Was Orlando alive then? No. Was his counsel around? That was when they discovered he was dead. Was his counsel around? I am not sure where his counsel was. But, again, counsel would probably have wanted a waiver from the Court before talking to defense attorneys. At least that's been my experience in investigating these claims, is it's one thing to get lay witnesses to talk to you, but it's not always so easy to get attorneys to do so. For refreshment and recollection, what were the circumstances that led the defense or the petitioner to discover Melendez's transcript? The attorneys that he had that were appointed that did his third post-conviction petition, excellent attorneys, still to this day some of the best attorneys in Arizona. And I think they took their duties under representing Mr. Running Eagle in his post-conviction proceedings very diligently, worked very hard. And I think when they found, as they were going through the motion to determine counsel and had also talked to the co-defendant's attorney, Melendez's name came up. And so at that point they began to search outside of the record in order to find what they could. And so they were able to find that transcript, which was the only publicly available thing, that had any information. And when was the transcript prepared? The transcript was prepared, I have the date. I think it was right that summer. In 1988. 1988, yes. But it was after the time, or it was right around the same time as the trial was already going on, that he was trying to withdraw from the plea. What about talking to Tilden's attorney, co-defense counsel? Tilden is still alive. He's serving a life sentence. So they, of course, have a duty to Mr. Tilden, and there would have to be a waiver before they would be allowed to give us any information about that. They have given various information about Mr. Running Eagle's case and his lawyer, but, of course, they have an ongoing duty to their client that they can't violate. So absent a waiver. Tell me again how you get around the argument that in the first post-conviction remedy petition, and as supplemented by the second one, the Brady issue was not fleshed out, and therefore the trial court was correct in the third PCR in denying it on 32.1E grounds. Well, denying it on 32.1E grounds has nothing to do with whether or not it was raised in the first one. When they clarified in their order on the motion for rehearing, they decided that that wasn't the issue, since it was raised as newly discovered evidence. I don't know why it wasn't found, why it wasn't found for the first or the second petition, but, I mean, this is Brady evidence that the state has a duty to disclose. I think Banks is very clear that having an inkling that something might exist doesn't mean – But just a second. If it's Brady evidence that has to be disclosed, in post-conviction proceedings, you have to prove that there was Brady evidence that had to be disclosed. Yes. And you didn't prove that. I think – We still haven't proven that. Well, I think we have proven that. I think we could have a better record had the state court allowed us to have a hearing and been able to get – And why did the state court allow you to have a hearing on your first PCR? Because you didn't ask for one. Well, the first PCR, this claim wasn't raised. Of course the claim wasn't raised, and that's exactly what – In the third PCR, the court said, not having raised it in the first PCR under Arizona rules, it's waived. But that's not what the court's ruling was, Your Honor. I got this one. This one's the 32. This is the 32.1e. That's a ruling on the merits of the claim. It was not found precluded. It was a ruling on the merits. The court clarified that in its order on rehearing. So it was an unreasoned ruling on the merits. So we have no idea whether they were saying that it wasn't diligent or that it didn't constitute – that there wasn't material. We don't know what their reason was. But there's nothing that changes – Because we're now – we're supposed to supply the reasoning. Yes, that's correct. Okay. And there's many, many parts to 32.1e beyond diligent. Yes. And so they could have easily – just easily concluded that it probably wouldn't have made a difference as to the sentencing. That could have been the conclusion, yes. And I think that if – We can't speculate as to what was in Melinda's file, but we can speculate as to what was in the mind of the court. Of the court. Apparently. Apparently, that's how it – You know, that's the rule. They're all upside down right now. It is. I think the law is constantly changing, so it's hard to tailor to that. But I think we have proven that this would have been material. Again, I say look at the special verdict. I think when you read the language of the special verdict, it is very clear – I mean, the court actually has a section where she says, to some extent, I will need to compare and contrast the evidence against these two defendants between them in order to make this determination. I mean, she comes out and says that expressly and then goes through to find all the differences in what Tilden's role was proven to be at trial. And I think had Running Eagle had other evidence, regardless of how credible Mr. Anderson thinks it is, that's not his job. The prosecutor doesn't get to make legal determinations about credibility or, you know, we decided not to use this evidence. That's not the standard under Brady.  If it is in any way exculpatory or impeaching for Mr. Running Eagle, it needs to be disclosed. And whatever Mr. Running Eagle's diligence requirements were during the third PCR, which I absolutely believe he met as soon as the evidence was discovered. I actually – I mean, I don't think diligence is probably the basis for that ruling. My question really more has to do with whether it would probably alter the outcome. The outcome. And I think if you look at the special verdict, I think it's hard to say it wouldn't. I mean, here – Well, to me – I mean, it seems to me it's equally likely that it could have – if it was believed, it could have blinded Tilden with the death penalty. And it certainly could have. But I think when you look at the case law – It doesn't necessarily mean that Running Eagle wouldn't have gotten the death penalty. I think if you look at the case law, what materiality means is whether there's a reasonable probability that this would undermine confidence in the verdict, that the outcome could have been different. The state rule itself says – has language in it that says that it would probably alter the outcome. I mean, it says the verdict probably. Exactly. That it probably – that the outcome would have been different. It undermines confidence in the verdict. And I think we don't know here what would have happened had this evidence been available. Had Mr. Running Eagle been able to use it at trial? Had he been able to convince the trial judge at least – I mean, there really was very little evidence as to who did what in this case. There was no eyewitness to the crime. The defenses were very different as to Mr. Tilden and Mr. Running Eagle. We don't really know what happened. It's all circumstantial evidence as to who did what. It could have been – you know, Mr. Tilden was found to have hit the victim on the head with a flashlight. It could be that Mr. Running Eagle did that. There was also testimony that Mr. Running Eagle had a flashlight. I mean, Mr. Running Eagle's knife, however much Mr. Anderson wants to stress that this was Running Eagle's knife, it was not proven to be the murder weapon. And obviously there was a murder weapon, but the state did not prove that it was Mr. Running Eagle's knife that killed those victims. So I think having that doubt as to what the murder weapon was and who did what, it absolutely undermines confidence in the outcome that when Mr. Tilden received a lesser sentence, based largely on his lesser role in these crimes, I think it absolutely undermines confidence that had the roles been reversed or had Mr. Running Eagle had more evidence that his role was lesser, that he would not have received the same treatment that Mr. Tilden did. And I think a lot of the mitigation was identical for the two of them. So I think that's the only thing we can look at to justify his lesser sentence is what the court believes his lesser role was. And I think that had Mr. Running Eagle had the same, I don't know how you can doubt or at least have a reasonable probability that he would have received the same treatment from the judge. Thank you. Okay. Thank you. Now we've had on both sides excellent arguments, and both of you have exhibited very high degrees of professionalism. And so we'd like to suggest that it might be nice if each of you could stay over, if you wish, stay over a few minutes. And many people that are sitting in the courtroom today are law clerks. And we just don't want you to talk about this case in any way, but just tell them what your job is and how you feel about it and how long you've been doing it and whether you like it. And give them some idea. I mean, when I got out of law school at Berkeley, I didn't even know there was such a thing as a public defender's office in 1950. And there were lots of things about what was going on in the real world that I wasn't aware of. And some would even say I'm still not aware of, but I'm trying to learn. So would you mind doing that? No. Just tell them about what work you do. I'm going to say quickly, a hotel is going to kick me out. Well, that's my job. No, that's my secretary job. I just call my wife. I need to get out, and I'll charge the theater. No, no, we'll call them. What hotel are you in? They won't. Is that the nice one down there? Yeah, the Westin? Well, the clerk will call. If they give you any trouble, just let me know. Well, what time is it? What? Why don't you call and ask for a late checkout? 11 o'clock. 11 o'clock. Oh, yeah, don't worry. You can still have a late checkout anyway. It's a big case. Yeah. Well, I'll get my credit card. You better say submitted for the record. Yeah, submitted. Thank you. All rise for the procession signing ceremony. Thank you. Thank you. Thank you.
judges: Pregerson, Wardlaw, Bea